## IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**June 30, 2026**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**ALLISON R.,**
**Respondent Below, Petitioner**

**v.) No. 25-ICA-311**　　(Fam. Ct. Raleigh Cnty. Case No. FC-41-2024-D-254)

**DEREK J.,**
**Petitioner Below, Respondent**

### MEMORANDUM DECISION

Petitioner Allison R.[1] ("Mother") appeals the Family Court of Raleigh County's June 18, 2025, final order that awarded Respondent Derek J. ("Father") primary custody of the parties' child.[2] Father filed a response in support of the family court's order. Mother filed a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the family court's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

The parties were never married but share a child together. The child was born in Raleigh County, West Virginia, in April of 2015. Father is a resident of Kanawha County, West Virginia. On June 28, 2024, Father filed a petition for support and allocation of custodial responsibility in Raleigh County, seeking 50-50 custody of the parties' child. Father contended that Mother was residing at an unknown address in Raleigh County with the child and worked at a McDonald's in Beckley. Father's petition alleged that Mother and the child lived in Virginia, Arizona, and Nevada within the last five years and asserted that "it was in the best interests of the child for the family court to assume jurisdiction of the case because one or both of the parents have a significant connection to West Virginia,

---

[1] To protect the confidentiality of the juvenile involved in this case, we refer to the parties' last name by the first initial. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n. 1 (1990).

[2] Both parties are self-represented.

and West Virginia is the location of a substantial number of witnesses and/or other sources of evidence relating to the children's current or future care and personal relationships."[3]

The record indicates that Father's first attempt to serve Mother with notice of Father's petition was unsuccessful. On August 20, 2024, the family court entered an order setting a hearing in the matter for October 2, 2024. After reissuing the summons, Mother was served with Father's petition and the notice of hearing by personal service on August 20, 2024, at the Travelers Inn in Raleigh County.

On September 5, 2024, Mother filed an answer objecting to Father's petition. Mother asserted that Father was a stranger to the child and had never been involved in the child's life. Mother contended that she had not heard from Father since the child was conceived and claimed that she left West Virginia after the child was born to flee Father's family.

At some point in 2024, Child Protective Services ("CPS") initiated an investigation regarding Mother's failure or inability to supply necessary shelter for the child. However, CPS' investigation concluded that the allegations were unsubstantiated.[4]

On October 2, 2024, the family court held a hearing on the matter. Father appeared in person and Mother appeared by phone. Father testified that he provided care for the child for months at a time until the child turned three years old. A CPS worker appeared and testified regarding her investigation. The CPS worker testified and informed the court that after utilizing the CPS database, her investigation concluded that neither parent had been involved in a West Virginia abuse and neglect proceeding. However, the worker testified that her recent investigation demonstrated that Mother lacked stability and was transient in nature. Mother testified that she was only in Raleigh County for a brief period of time and that she resided in Raleigh, North Carolina with the child. Testimony revealed that Mother had lived in Arizona and Nevada before residing in West Virginia, and that she relocated to Raleigh, North Carolina a few days after being served with Father's petition.

The family court held another hearing on November 1, 2024. Father appeared in person and Mother appeared telephonically. However, due to phone connection issues with Mother during the hearing, the family court reset the matter and ordered Mother to appear in person at the next hearing scheduled for November 12, 2024. The court orally stated that Mother had not introduced any evidence that Father was an unfit parent, and thus, he was entitled to parenting time. The court ordered Mother to bring the child to West Virginia on November 9, 2024, for Father to exercise parenting time from 12:00 p.m. to 5:00 p.m. in

---

[3] Father also stated that he believed that no other state had jurisdiction over the case.

[4] The full CPS investigation report is not in the appendix record before this Court as Mother only produced CPS' cover letter and the page including their findings.

Beckley. The family court incorporated its orders and rulings into a temporary order entered on November 4, 2024.[5]

On November 12, 2024, the family court held another hearing on the matter, where both parties appeared in person. Both parties testified that Father's visitation with the child on November 9, 2024, went well. A review of the hearing displays that the parties appeared happy and affable. The court scheduled a status hearing for January 6, 2025, with the parties present in the courtroom and filed a notice of that hearing date immediately following the conclusion of the November 12, 2024, hearing. The court entered a temporary order following the November 12, 2024, hearing that awarded Father communication with the child via an electronic device every day at 6:00 p.m. and permitted the child to contact Father at any time.

On January 8, 2025, the family court entered an order rescheduling the January 6, 2025, hearing to January 27, 2025, and ordered the parties to appear. The order reasoned that the family court was closed on January 6, 2025, due to a winter storm.

The family court held a hearing on January 27, 2025. Father appeared in person, but Mother failed to appear in person or by phone and had not updated her contact information with the clerk or court. As such, the family court did not have a current working phone number for Mother. Father testified that Mother relocated again after the last hearing. Father stated that Mother relocated to a motel in Greensboro, North Carolina. He testified that he talked to the child every day via FaceTime. Father testified that his concerns stemmed from the child's lack of stability, particularly concerning her education. Father testified that he contacted the child's school in North Carolina and learned that she had a high number of absences since enrolling. The family court found Father's testimony credible.

On January 28, 2025, the family court entered a final custody order awarding Father primary custody of the child. The court found that Mother had lived in three different hotels since Father's initial filing and that CPS' prior testimony was that Mother's housing conditions with the child were transient. The court found that the child missed a significant amount of school during the month of December, and that based on the evidence, Mother continuously failed to provide a stable home for the child and created an emergency circumstance regarding the care of the child. The court determined that it was in the child's best interest to award Father with primary custody of the child and that Mother's parenting time was in Father's discretion.

On February 25, 2025, Mother filed a motion to reconsider and a motion to vacate and set aside the January 28, 2025, order, and award her primary custody of the child.

---

[5] The court's order did not reflect the court's oral finding that Mother had not introduced any evidence that Father was an unfit parent.

3

Mother asserted that she did not receive the rescheduling notice for the January 27, 2025, hearing, and that it was not in the child's best interest to be with Father, who she had only seen three times. Mother acknowledged that she did not receive notice because she relocated to a different part of town for a short-term rental. Mother alleged that the child had not missed many days of school but that the child had not turned in her absence excuses. The family court scheduled a hearing on Mother's motions for April 24, 2025.

On April 24, 2025, Mother appeared in person for the family court's hearing on her motions. Father appeared telephonically. Mother testified that she did not receive any notice for the January 27, 2025, hearing. Mother asserted that she and the child had lived in Virginia, Arizona, Nevada, West Virginia, and North Carolina. Mother testified that she currently lived in Greensboro, North Carolina, in a rental home with her mother, and worked at Walmart. Mother testified that she had been in contact with the child. Mother consented to Father having equal custody but objected to Father having primary custody. Father testified about the steps he had taken concerning the child's education since receiving primary custody.

Following the hearing, the family court entered a temporary order on April 25, 2025, awarding Father primary custody of the child and allowing Mother to exercise parenting time at any time in Kanawha County. The court ordered Father to make every effort to have the child available for any visitation or contact between the child and Mother. In support of its ruling, the court found that Father enrolled the child in public school in Kanawha County and the child's test results revealed that while she was in the fourth grade, she was functioning on a first or second grade level. The school informed Father that the child would be repeating the fourth grade but would continue administering tests to determine her functioning grade level throughout the rest of the school year. The court found that Mother moved from an apartment in Raleigh, North Carolina, to a communal home in Greensboro, North Carolina, and planned to move again on May 1, 2025. The court determined that the May 1, 2025, relocation would be Mother's fifth known residence since Father filed his initial petition. The court explained that Mother's failure to establish a stable residence would impact the child's education due to the child's need for continued testing in the current semester, finding that Mother's inability to establish a stable residence and the child's educational limitations overcame the presumption of equal custody.

On June 10, 2025, the family court held a final hearing on Mother's motion for reconsideration of the January 28, 2025, order. On June 18, 2025, the family court entered a "Final Review Order Following June 10, 2025, Hearing." The order reiterated the court's previous findings from the April 25, 2025, temporary order concerning the child's education and Mother's inability to establish a stable residence. The court found that since entry of the previous order, the child was referred to summer school in Kanawha County for mathematics and language, that Mother was now residing in a rented basement with her mother in a home owned by a third-party couple in Greensboro, North Carolina, that Mother visited the child once since April 2025, and that Mother had not contacted

4

representatives of the child's school due to having been "busy a lot." The court explained that throughout the court's proceedings, Mother resided in a hotel room in Raleigh County, West Virginia, and three separate residences in the State of North Carolina; Mother testified that another intended relocation was imminent. The court noted that Mother lived with the child in Arizona and Nevada before residing in West Virginia. Determining that it was in the child's best interest to remain in the primary custody of Father, the court reasoned the following:

> In this case, several evidentiary factors exist to rebut the presumption of equal custody. Specifically, such factors include that: (1) the parties do not live in a proximity that custody could be equally shared; (2) [Mother] maintains a transient residential status[;] (3) the educational needs of the child require stability; and (4) [Mother] is not currently participating in educational matters regarding the parties' child.

The court awarded Mother parenting time whenever she travels to West Virginia so long as she provides Father with ten days' notice of her intent to exercise parenting time. The court also gave Mother unrestricted access to contact the child via the child's cell phone. Mother's child support obligation was set at zero to "reflect the cost of travel to the State of West Virginia borne solely by [Mother]." The court also ordered the parties to utilize Appclose in the event they have trouble communicating. It is from this June 18, 2025, order that Mother now appeals.

When reviewing the order of a family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders). "[J]urisdictional issues are questions of law[.]" *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 239 W. Va. 338, 343, 801 S.E.2d 216, 221 (2017) (citation omitted). "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

Mother argues four assignments of error on appeal. First, she argues that the family court did not have jurisdiction pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA")[6] because the child had not resided in West Virginia for six months. In support of her argument, she contends that North Carolina had proper jurisdiction. We disagree.

The UCCJEA utilizes a multi-step process to determine whether a state has jurisdiction to make an initial child custody determination. *See Josette F. v. Jaret O.*, No. 23-ICA-164, 2024 WL 1256001, at *4 (W. Va. Ct. App. Mar. 25, 2024) (memorandum decision). There are four jurisdictional grounds that operate in the order of priority, and one must be satisfied before a court of this state can make an initial child custody determination. *See In re K.R.*, 229 W. Va. 733, 740, 735 S.E.2d 882, 889 (2012). The four bases of jurisdiction in order of priority are "home state," "significant connection," "jurisdiction because of declination of jurisdiction," and "default" jurisdiction. *See id.* Home state jurisdiction is paramount and defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." W. Va. Code § 48-20-102(g).

Here, the record reveals that Mother and the child were living in Raleigh County when Father initiated the action in June 2024 and were still living there at least on September 5, 2024, pursuant to the address provided in Mother's answer.[7] It is unclear whether Mother and child lived in Nevada or Arizona prior to residing in West Virginia and for how long due to her transient nature. Regardless, no parent or person acting as a parent remained living in Nevada or Arizona for the purposes of home state jurisdiction. Thus, *if*, as Mother argues on appeal, she and the child had not resided in West Virginia for six months when the action was commenced, the child had no home state for UCCJEA purposes, yet the family court's authority to render an initial child custody determination remained proper pursuant to "significant connection jurisdiction." *See* W. Va. Code § 48-20-201(a)(2).

Although Mother argues that she had no intent to remain in West Virginia, and had plans to live in North Carolina with the child during their entire stay in West Virginia, as the Supreme Court of Appeals of West Virginia has pointed out, "[c]ourts have recognized that it is the child's presence—not a parent or child's residence, domicile or subjective intent—that is relevant to determining a child's home state." *In re Z.H.*, 245 W. Va. 456, 468, 859 S.E.2d 399, 411 (2021) (citation modified); *accord*, *Sajjad v. Cheema*, 428 N.J.Super. 160, 172-73, 51 A.3d 146, 154 (2012) ("determination of the child's legal

[6] The UCCJEA is codified at W. Va. Code §§ 48-20-101 to -404 (2001).

[7] Mother's filed emails to the family court's staff state that, "[s]omehow [Father's] mom found out that we were in Beckley and tracked us down . . . in June [of 2024]."

6

residence or domicile is unnecessary as the statutory language 'lived,' included within the definition of home state, connotes physical presence within the state, rather than subjective intent to remain."). We further find no merit in Mother's argument that her relocation to North Carolina with the child gave North Carolina appropriate jurisdiction because "the child's living arrangements after the commencement of the proceeding, are not relevant to the determination of whether the court has home state subject matter jurisdiction." *In re Z.H.*, 245 W. Va. at 466, 859 S.E.2d at 409. Mother did not move to North Carolina until sometime after the proceeding commenced. *See* W. Va. Code § 48-20-102(e) ("'Commencement' means the filing of the first pleading in a proceeding."). Thus, we find that the family court had proper jurisdiction to make an initial custody determination pursuant to the UCCJEA.

For her second assignment of error, Mother argues that the family court erred by violating her due process rights and allowing Father to remove the child from her custody without proper evidentiary hearings or findings of imminent danger as required by West Virginia Code § 49-4-602 (2015). We disagree. First, the statute Mother relies on does not apply to the current matter as it pertains to abuse and neglect petitions filed in circuit courts. Next, regarding her due process argument, "[i]t is axiomatic that the due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." *David C. v. Tammy S.,* 244 W. Va. 577, 581, 855 S.E.2d 885, 889 (2021) (citation modified). "To deprive a parent of visitation rights without a hearing would constitute a denial of due process and equal protection under our state and federal constitutions." *J.M.S. v. H.A.*, 161 W. Va. 433, 436, 242 S.E.2d 696, 698 (1978).

Here, Mother was provided with notice and an opportunity to be heard. A review of the hearing reflects that Mother appeared in person at the final hearing and testified in support of her position that the parties should have equal custody. The court permitted the parties to testify and submit supporting arguments. Thus, we are unable to find that the family court violated Mother's due process rights.

To the extent Mother is arguing that the family court erred by awarding her less than equal custody, we disagree and find no error or abuse of discretion. The court justified deviating from the rebuttable presumption of equal custody by finding the following: "(1) the parties do not live in a proximity that custody could be equally shared; (2) the [Mother] maintains a transient residential status[;] (3) the educational needs of the child require stability; and (4) the [Mother] is not currently participating in the educational matters regarding the parties' child."

Further, in the event that Mother is arguing a separate matter within her second assignment of error, we decline to address it. As we have previously observed, we cannot consider indecipherable arguments made in appellate briefs. *See Vogt v. Macy's*, *Inc.*, 22-ICA-162, 2023 WL 4027501, at *4 (W. Va. Ct. App. June 15, 2023) (memorandum

7

decision) (citing *State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) (explaining that appellate courts frequently refuse to address undeveloped, perfunctory, or cursory arguments on appeal). Mother failed to comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure, which states that a petitioner's brief "must contain an argument clearly exhibiting the points of fact and law presented" and "appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." Under Rule 10(c)(7), this Court "may disregard errors that are not adequately supported by specific references to the record on appeal." As such, we decline to address any remaining arguments within Mother's second assignment of error.

For her third assignment of error, Mother argues that the family court's finding that she was "unstable" due to her multiple relocations was clearly erroneous because there was no proof of unfitness or neglect. We disagree. The Supreme Court of Appeals of West Virginia has stated that,

> this Court will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous. . . . Generally, if there is competent evidence to support factual findings, this Court will not reverse those findings as clearly erroneous. *See* Syl. Pt. 3, *Estate of Bossio v. Bossio*, 237 W. Va. 130, 785 S.E.2d 836 (2016) ("'A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, in part, *In re Tiffany Marie S.,* 196 W. Va. 223, 470 S.E.2d 177 (1996)."). It is within the sole province of the family court, as fact-finder, to decide issues of credibility, and this Court will not disturb those determinations. Even where testimony is uncontroverted, a fact-finder is free to disregard such testimony if it finds the evidence self-serving, and not credible.

*Mulugeta v. Misailidis*, 239 W. Va. 404, 408-09, 801 S.E.2d 282, 286-87 (2017). The family court heard testimony about Mother's transient lifestyle, and Mother testified that she had lived in West Virginia, Virginia, Nevada, Arizona, and North Carolina in recent years. Further, Mother relocated to five different residences within a year during the pendency of the proceedings below. Thus, we find no clear error in the family court's finding that Mother was unstable due to her transient lifestyle.

For her last assignment of error, Mother argues that the family court erred by issuing an order that denied her access to the child. In support of her argument, Mother contends that while the order grants her unlimited access to the child, it requires her to unfairly bear

all the travel costs and allows Father to withhold information from her. We disagree. While West Virginia Code § 48-13-701 (2001) provides that child support "guidelines must be applied to all actions in which child support is being determined[,]" section 702 describes an exception, stating that,

> [i]f the court finds that the guidelines are inappropriate in a specific case, the court may either disregard the guidelines or adjust the guidelines-based award to accommodate the needs of the child or children or the circumstances of the parent or parents. In either case, the reason for the deviation and the amount of the calculated guidelines award must be stated on the record (preferably in writing on the worksheet or in the order). Such findings clarify the basis of the order if appealed or modified in the future.

W. Va. Code § 48-13-702(a) (2001).

Here, after awarding Father primary custody of the child, the family court gave Mother parenting time "when she travels to the State of West Virginia" so long as she provides Father with ten days' notice of her intent to travel. The court explained why Mother was required to bear all the travel costs when she exercises her parenting time, reasoning that it deviated from the child support guidelines to "reflect the cost of travel to the State of West Virginia borne solely by [Mother]." Thus, because the court set Mother's child support obligation to zero, we are unable to conclude that the family court abused its discretion by requiring Mother to bear all travel costs associated with her parenting time.

Mother's argument that the family court's order allows Father to withhold information, communication, and records is unsupported by the record. The court gave Mother "unrestricted access to contact the infant child's [sic] via the child's cell phone." Both parties were granted access to any and all medical and educational records for the child and ordered the parties to communicate via Appclose if their communication ever became difficult. Mother's contention that the family court allowed Father to block her from the child's phone was never raised below. Rather, during the final hearing, the family court specifically asked Mother if she had been in contact with the child and she answered in the affirmative. As such, we decline to consider this argument for the first time on appeal. *See Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009) (citations and quotations omitted) ("Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.").

Based on the foregoing reasons, we affirm the family court's June 18, 2025, final order.

Affirmed.

**ISSUED:** June 30, 2026

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Charles O. Lorensen
Judge S. Ryan White